***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Kim Ledford with minor modifications.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing as: *Page 2 
 STIPULATIONS
1. On July 31, 2006, the date of plaintiff's injury by accident giving rise to this claim, the above-noted parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On July 31, 2006, an employee-employer relationship existed between the plaintiff, Dave Mathis and the employer, W.E. Bolton Construction and. Services.
3. On July 31, 2006, Stonewood Insurance Company was the carrier on the risk.
4. On July 31, 2006, plaintiff experienced a compensable accidental injury to his back.
5. The parties agreed that Industrial Commission forms and pleadings and medical records identified in the Pre-Trial Agreement could be received into evidence.
6. At the time of hearing, for purposes of hearing only, plaintiff was receiving compensation at the rate of $222.13 per week, based upon an average weekly wage of $333.18.
7. A Form 22 was included with the stipulated documents. Subsequent to the hearing, the Deputy Commissioner received correspondence from both counsel, indicating that pursuant to the Form 22, plaintiff's average weekly wage should be $367.87, yielding a compensation rate of $245.24.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-three years of age, having a birth date of January 31, 1964. *Page 3 
2. On July 31, 2006, plaintiff was working for the defendant-employer as a plumber's helper. Plaintiff duties included working with "setting" plumbing fixtures such as toilets or sinks and installing or "running" metal pipes.
3. Plaintiff carried a tool bucket containing the tools he needed to his job. Per plaintiff's estimate, the tool bucket weighed about 50 pounds. The pipe he worked with would weigh between 50-200 pounds and the fixtures he worked with were heavy, generally weighing more than 50 pounds.
4. Plaintiff was working as a plumber's helper on July 31, 2006, when he injured his back. Plaintiff was near the top of a 12-foot stepladder cutting a pipe. After completing a cut, the pipe usually fell loose from the tool. On this occasion, as he finished cutting through the galvanized pipe, it stayed with the tool and jerked plaintiff around on the ladder. The pipe and the tool together were very heavy, by plaintiff's estimate, around 100 pounds. Plaintiff did not want to drop the pipe and the tool, so he kept a grip on it and handed it to his boss, who was standing by the ladder. Plaintiff felt like he had "wrenched" his back "real bad" and felt pain in his lower right back.
5. Plaintiff's boss asked him if he was all right. Plaintiff responded that he was not and that he was hurt. Plaintiff descended from the ladder and remained at work the rest of the day. However, per plaintiff's testimony, he was in a great deal of pain and did not do much work the remainder of the day.
6. Plaintiff had never felt pain in this area of his back before. Prior to this accident, plaintiff had no problems doing this very physical work, which involved a great deal of heavy lifting.
7. The next day plaintiff sought medical care with ProMed Minor Emergency, where *Page 4 
he reported injuring his back while on a ladder and cutting a piece of iron pipe. Plaintiff told the healthcare provider at ProMed that he had awakened with more pain and on that morning was having difficulty moving. Plaintiff denied previous back problems.
8. Because of the ongoing and severe pain plaintiff was experiencing, plaintiff was referred to Michael Goebel, M.D., an orthopedist practicing with Blue Ridge Bone and Joint Clinic, P.A. in Asheville. Plaintiff first saw Dr. Goebel on August 16, 2006. At that time, plaintiff described a twisting injury, which occurred when he was cutting a four-inch cast pipe on a ladder, and jerked his back in a twisting fashion.
9. On this visit of August 16, 2006, Dr. Goebel assessed plaintiff with possible right sacroiliac joint myofascial pain and right lower extremity sciatica. Dr. Goebel performed trigger-point injections with steroids over the right sacroiliac joint region, and recommended that plaintiff undergo physical therapy.
10. When plaintiff returned to Dr. Goebel on September 6, 2006, plaintiff was complaining of persistent pain in his back with severe pain in his right leg. Dr. Goebel believed at that time that plaintiff may have a herniated disc, and recommended that plaintiff undergo an MRI scan, which was subsequently done.
11. When plaintiff returned on September 20, 2006, Dr. Goebel noted that plaintiff tended to sit on his left buttocks and complained of primarily right-sided pain. Dr. Goebel reviewed the MRI scan, which showed disc degeneration of a disc at L4-5 and L5-S1 with a left paracentral to far-lateral protrusions that could involve the left L4 and L5 nerve roots. On this date, Dr. Goebel gave plaintiff another injection in the sacroiliac joint region.
12. Plaintiff's rehabilitation nurse, Frank Radford, RN, CCM, characterized plaintiff's CT Myelogram's finding of a moderately prominent left generalized posterior lateral area of disc *Page 5 
protrusion extending to the neuroforamen at L5-S1 and perhaps involving the left L5 as well as significant findings involving a nerve root and encroachment upon the neuroforamen.
13. Dr. Goebel continued to treat plaintiff, seeing him on October 18, 2006 and November 17, 2006. Dr. Goebel testified that plaintiff had antalgic gait or was limping. Between the November 2006 evaluation and December 29, 2006, plaintiff underwent an L5-S1 epidural steroid injection, after which he reported about five days of pain relief. However, his pain recurred at the same levels as prior to the injections.
14. Dr. Goebel continued to see plaintiff and provide care in the spring of 2007. Dr. Goebel did not think the MRI scan showed signs of neurologic impingement. In his opinion, plaintiff was suffering from chronic right sacroiliac joint pain, not shown on the MRI.
15. During the hearing of this claim on June 6, 2007, the Deputy Commissioner observed that plaintiff was uncomfortable. He sat with his weight shifted to one side, not fully sitting on the chair.
16. Dr. Goebel was continuing to provide care through his deposition of June 20, 2007, seeing plaintiff approximately once a month. As of June 13, 2007, the last time Dr. Goebel saw plaintiff prior to his deposition, plaintiff had undergone four or five chiropractic treatments with Michelle Greenspan, D.C. Plaintiff had found these chiropractic treatments briefly helpful. However, plaintiff reported his pain would seem to recur 4-5 hours after the chiropractic treatment.
17. As of her deposition, on August 2, 2007, Dr. Greenspan did not believe that plaintiff had reached maximum medical improvement and that he would need at least another ten chiropractic visits.
18. Plaintiff's rehabilitation nurse, Frank Radford, R.N., testified that Dr. Goebel *Page 6 
released plaintiff from his care in August 2007, stating that plaintiff had reached maximum radical improvement. However, Mr. Radford observed plaintiff exhibiting the same pain behaviors in August as he had observed six months prior to August 2007.
19. When plaintiff was released by Dr. Goebel, in the opinion of Mr. Radford, plaintiff's day-to-day activities of normal living continued to be significantly limited. Plaintiff still appeared to be in a great deal of pain. Plaintiff told Mr. Radford that he wanted to be referred to Dr. Laura Fleck for care.
20. Plaintiff was examined by Dr. Laura Fleck on March 26, 2007. It was plaintiff's impression that Dr. Fleck seemed to care about his pain. He did not have the same confidence in Dr. Goebel. Dr. Fleck explained more to plaintiff about his problems than Dr. Goebel had done, and made plaintiff feel more hopeful about treatment.
21. Plaintiff also has a great deal of confidence in Dr. Fleck in part, because his wife had a cervical problem which Dr. Fleck diagnosed and for which his wife underwent surgery with one of Dr. Fleck's partners. Plaintiff's wife returned to work six weeks after her surgery, and was working at the time of this hearing in June 2007.
22. Dr. Fleck is a neurologist who works at Spine Carolina in Asheville. Dr. Fleck has extensive experience in treating back disorders, having run an Out-Patient Spine Program at Allegheny General in Pittsburgh, Pennsylvania and organized a Spine Program at the Henry Ford Health System in Detroit, prior to coming to work at Spine Carolina in Ashevil1e, North Carolina.
23. Per Dr. Fleck's testimony, when she saw plaintiff, he both gave a history of how the accidental injury of July 31, 2006 occurred, and she had plaintiff demonstrate for her how this injury occurred. Dr. Fleck summarized plaintiff's description of his injury as being sharply *Page 7 
hyperflexed forward and to the right side.
26. Dr. Fleck observes people when they are walking back from the waiting room to the exam room, when they do not realize they are being watched. Dr. Fleck noted that plaintiff appeared to be in genuine pain and distress and that plaintiff was avoiding putting any weight on his right leg. When she examined him, plaintiff held himself in what Dr. Fleck called a "shifted position", meaning that he was bent to the left. Per Dr. Fleck, this is an indicator that plaintiff was mechanically unloading his right back and leg. Dr. Fleck also noted that plaintiff changed positions frequently when he was seated, which was again an indication of genuine discomfort.
25. Upon examination, Dr. Fleck noted exquisite tenderness in the right sciatic notch. Upon palpation at that spot, Dr. Fleck was able to reproduce plaintiff's pain, extending into the right side. Dr. Fleck also found that plaintiff had a positive straight leg raise test on the right, and avoided full weight bearing on the right when he walked. Upon examination, plaintiff had a positive facet loading test, by which Dr. Fleck reproduced plaintiff's centralized pain at the level of the facets when plaintiff was extended backwards, which indicates there may be a facetal component to plaintiff's pain.
26. Dr. Fleck reviewed plaintiff's MRI scan, noting that it revealed a narrowing on the right at the neuroforamina, which she testified was consistent with plaintiff's symptoms on the right. After reviewing plaintiff's MRI testing and after taking a history from plaintiff, it was Dr. Fleck's impression that plaintiff was suffering from a right L5 radiculalgia, which is related to a disc herniation and protrusion as noted on plaintiff's MRI scan.
27. It was Dr. Fleck's opinion that plaintiff's mechanism of injury, which involved being suddenly wrenched forward to the right, is consistent with an injury to the disc, either tearing it or moving it out of normal position and onto the nerve, which was what Dr. Fleck *Page 8 
believed had happened. During Dr. Fleck's deposition of September 17, 2007, she was shown by defense counsel the EMG testing that took place after her examination of plaintiff. Dr. Fleck testified that nothing in those test results changed her opinion regarding plaintiff's problems and did not change her recommendations of care.
28. As of Dr. Fleck's examination of March 26, 2007, in her opinion, plaintiff had exhausted conservative care and should be referred to Dr. Moody, a spine surgeon in her practice, for surgical consultation. She would defer any assessment of the appropriateness of surgery to Dr. Moody.
29. Dr. Goebel and Dr. Fleck have disagreed as to any correlation between the MRI results and plaintiff's subjective pain complaints on the right side. However, after careful consideration of the medical evidence of record, it is found that plaintiff has not made any significant progress towards recovery while treating with defendant's physician of choice, Dr. Michael Goebel.
30. Based upon the competent and credible evidence of record, plaintiff continues to experience severe and disabling back pain for which he requires additional medical treatment. Plaintiff's request to change his treating physician to Dr. Laura Fleck is reasonable for the reasons found as fact above and should be approved.
31. The defendants introduced into evidence a video of surveillance conducted on plaintiff which includes a total of about 20 minutes over different dates. The Deputy Commissioner reviewed the same and found it of no practical assistance in assessing plaintiff's pain or his ability to engage in sustained work activities. The only inconsistent behavior is plaintiff riding on a motorcycle, which he did not do for an extensive length of time. The Full Commission agrees with the findings of the Deputy Commissioner regarding the video. *Page 9 
32. Plaintiff acknowledged that he occasionally rides his motorcycle to get "out of the house to keep from screaming at my kids and my wife, so angry that I can't do anything else." Dr. Greenspan stated in her deposition that Mr. Mathis would not be able to ride a motorcycle for more than 15 minutes, given his permanent condition.
33. Based upon all the evidence, plaintiff continues to be in genuine and significant pain. He is not capable at this time of carrying out sustained activity. Plaintiff is not able to return to work earning the same wages he earned prior to his injury by accident.
34. Plaintiff is not at maximum medical improvement. It would be futile at this time to order plaintiff to comply with vocational rehabilitation.
35. Based upon the Form 22 submitted and the correspondence from counsel regarding the same, plaintiff had an average weekly wage of $367.87 and a compensation rate of $245.24. Based upon the prior documents and stipulations, including the Form 60, defendants have paid plaintiff at a rate of $222.13 per week and have underpaid plaintiff's ongoing total disability compensation by $23.11 per week since the accident date.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff continues to suffer ongoing and disabling back pain as a result of the compensable work-related injury, which he sustained to his back on July 31, 2006. Plaintiff is unable to earn wages in any employment at this time and continues to be temporarily totally disabled and entitled to compensation. N.C. Gen. Stat. § 97-29.
2. Plaintiff is in need of additional medical treatment and his request for a change of *Page 10 
physician should be granted. N.C. Gen. Stat. § 97-25.
3. Plaintiff has not reached maximum medical improvement. It would be futile for him to attempt vocational rehabilitation at this time. N.C. Gen. Stat. § 97-25.
4. As defendants did not appeal the Deputy Commissioner's finding of facts concerning plaintiff's correct average weekly wage, plaintiff's correct average weekly wage is $367.87, with a compensation rate of $245.24. Plaintiff has been underpaid by $23.11 per week from the date of injury to the present, based upon the payments of $222.13 per week. As this amount is more than fourteen days past due, defendants shall pay a ten percent (10%) penalty of the accrued past due total directly to plaintiff. N.C. Gen. Stat. §§ 97-2(5), 97-18(g).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's request for a change of treating physician to Dr. Laura Fleck is granted.
2. Defendants shall continue to pay all reasonably necessary medical expenses as may be incurred by plaintiff for treatment of his back injury of July 31, 2006, including such treatment as may be prescribed or recommended by Dr. Fleck.
3. A North Carolina Industrial Commission nurse is hereby appointed to facilitate care with Dr. Fleck and such other care as is necessary to effect a cure, give relief or lessen the period of plaintiff's disability.
4. Defendants shall pay plaintiff ongoing temporary total disability at the rate of $245.24 per week. The same is subject to an attorney's fee.
5. Defendants shall pay plaintiff all accrued benefits due, based upon the difference *Page 11 
of $23.11 per week due plaintiff since the date of his injury. Such benefits shall be paid in a lump sum with the addition of a ten percent penalty and are subject to the attorney's fee.
6. Defendant's motion to compel plaintiff to comply with vocational rehabilitation is denied.
7. A reasonable attorney's fee of 25% of the benefits due plaintiff as temporary total disability is approved for his attorney. Twenty-five percent of the lump sum due plaintiff shall be paid directly to his attorney. The penalty due shall be paid directly to plaintiff. Thereafter, plaintiff's counsel shall receive every fourth check otherwise due plaintiff as total disability compensation.
8. Defendants shall pay the cost.
This the 29th day of September 2008.
 S/___________________
 DANNY LEE McDONALD
 COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG CHAIR
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER *Page 1